Yes, the clerk, are we ready to proceed with the next case on the calendar? All right, then we'll take up the next case, Puki v. County of Okanogan. Puki v. County of Okanogan So, my understanding first is that counsel for the appellees are going to be splitting their arguments seven and a half minutes each, is that right? All right, and so when you're up there, the clock will show for each of you seven and a half minutes, not the entire 15. All right, when you're ready, counsel. Good morning, and may it please the court. My name is Alex Dietz, and I am here on behalf of Michelle Puki as personal representative of the estate of Lori Langdon. I'd like to reserve five minutes for rebuttal. We're here today to ask that the court reverse the district court's order dismissing our federal civil rights claims brought by my client, and in so doing, also reinstate the state law claims that were dismissed when the court declined to exercise supplemental jurisdiction. So, counsel, I apologize for interrupting you so early, but just in terms of what you just said, could you tell us is anything happening with the supplemental claims right now? I assume by anything happening, you mean if there's been a separate filing or anything like that? Yes, is anything going? It has not. Okay, so that's just waiting for the disposition of this appeal. That's correct. All right, thank you, counsel. Sorry to interrupt. No problem. So this case, as the panel knows, arises from the death of Lori Langdon following her 21-hour incarceration at the Okanogan County Jail, during which time she was experiencing an episode of her diagnosed conversion disorder, which she herself has described as a pseudo seizure, essentially, that resulted in her immobility, inability to speak, and incontinence. Instead of arranging for medical attention during this 21-hour incarceration, her jailers left her in a supine position on her back on the floor, on a mat on the floor, for nearly a full day. As a result, she developed pneumonia and a large blood clot, which ultimately killed her. As part of her experience at this jail, it's important to remember that she was in the throes of this pseudo seizure conversion disorder the entire time, and she herself has described what that feels like as, essentially, like I was dying. That's the position that she's in while she's in this jail. And as I understand your expert reports, they indicate that lying in this type of position, unmoving for someone in the decedent's position, increases a known risk of both pneumonia and PE. That is correct, Your Honor. And not just our expert, but also the expert pulmonologist retained by the county, agreed that blood clots grow while there is a prolonged period of immobility, and that the blood clots that resulted in the pulmonary embolism in this case did, in fact, grow while she was laying in the jail. The district court here determined that the defendants were all entitled to dismissal under qualified immunity for the 14th Amendment claims, and this required the court to determine one of two things, either that her rights had not been violated, or that if they had, the rights were not clearly established in law. There wasn't really any dispute at the trial court level about whether or not the right was clearly established, the right to adequate medical care. All right, so let me concentrate my question on one of the defendants, Mr. Kopp. So what case clearly established that a person in Mr. Kopp's position would be violating the constitutional rights of the decedent by his actions? And, again, I'm not asking about any of the jail people. I'm asking about Mr. Kopp. Yes, and, Your Honor, I think part of the focus of the analysis for Mr. Kopp is understanding the factual disputes between the parties about what his role was and what he was capable of doing. But, again, he was not on the jail staff. He had no ability to exercise the type of control in custody of a quote-unquote jailer. Isn't that right? That's, we think, a disputed issue of fact in this case, Your Honor. Okay, explain to me how that can be an issue of fact. And so based on the contract between the county and OBHC, Kopp was essentially serving as, for lack of a jail having its own in-house mental health services system, they contracted with OBHC to serve as that role within the jail. So they're acting under contract with a state actor, and I'm trying to find the exact case that says that that is exactly how that relationship is considered. We did cite them in our briefing. The cases that I'm looking at here include Collins v. Woman Care, 878 Federal 2nd, 1145, and then Lopez v. Department of Health Services, 939 Federal 2nd, 881, which explain that when a private actor is engaging in acts that are fairly attributable to the county or to the governmental entity, then those acts can be considered to have been under the color of state law. I guess I have the same question as my colleague. Let's tie Mr. Kopp to that. Did he even know that this individual was in custody in the county jail? Yes, Your Honor, and part of the distinction for these claims, too, is that while our briefing outlined the facts about his interactions with Lori Langton before she went to jail, the focus of the federal claims is on his interactions with her at the jail and in that time period, where he's learning about her being at the jail, going to the jail, and what he's doing there. That's where the focus of the federal claims is. The stuff about what he did before is important context because it provides the background information of what he knew. But on the—I'm sorry, did I interrupt? No, you're fine. The Supreme Court, on occasion, has instructed our court, when dealing with qualified immunity, to look at cases and notice at other than a high level of generality and has, on occasion, criticized our court for not doing so. With regard to Mr. Kopp, how do the cases you cite do anything other than state a general principle at a high level of generality, which strikes me as insufficient to meet the Supreme Court standard with regard to qualified immunity? Well, Your Honor, I appreciate this question because I had the same one when I was looking through the Ninth Circuit's case law. And my understanding of that case law body for this specific issue of narrowing to a more concrete example is that I was unable to find a specific Ninth Circuit case that said, yes, there is a DMHP who has this responsibility. What I was able to find is a series of cases in other circuits that address the issue of whether or not a mental health practitioner can be considered to have acted under the authority of a governmental entity. And the ones that we looked at in particular were those Sixth Circuit cases, Green and its progeny, that talked about that. And there's a couple other cases we cited in the briefing from, I think, the Tenth and Eleventh Circuits that talk about how a mental health practitioner can be held responsible. I understand there is case law from other circuits. If I could, before you go into your rebuttal time, just ask you about another defendant. From your perspective, why don't you give me the best facts in the light most favorable to you to hold Supervisor Stewart accountable under 1983? Yes, Your Honor. And there are two components to holding Chief Stewart accountable. One is his direct involvement, which is fairly minimal. It's at most half an hour additional delay in treatment, which, you know, in distinguishing between our different types of damages claims here, there's the damage from the death and then the damage from the pain and suffering from the ongoing experience of the conversion disorder. And he had an impact on the ongoing experience of pain and suffering from the conversion disorder. But obviously, by the time he's called, it's too late. She's got the blood clot. So he's not going to be held liable under for the death for that, but he can still be held liable for the pain and suffering extended. The more, I think, impactful responsibility for him is in his supervisory capacity as the person responsible for training and ensuring that qualified and competent medical providers and mental health practitioners are available to essentially screen pretrial detainees. If, as a theoretical or a hypothetical matter, we were to disagree with you as to Supervisor Stewart, but again, hypothetically, we were to agree with you vis-a-vis Monell as to the jail, is there anything you actually lose? Well, I think in terms of ability to pursue damages, the only thing we would lose is the ability to seek punitive damages against Chief Stewart directly because under the court's existing precedent, we cannot seek the punitive damages directly against the county that we could seek against Chief Stewart for his personal involvement in failing to train. And when I look at his personal involvement here, and I'll tap into my rebuttal time a little bit, I think it's important to reflect on the fact that this wasn't the first death at the jail. Well, this death took place after she left the jail, but related, there were several prior deaths, and after those, Chief Stewart testified and the county's 30B6 rep testified. We never did an investigation. We never disciplined anyone. We never did any retraining. We didn't improve our medical training for any of our people screening folks going into the jail after those deaths, and they didn't do it here either. And I think that supports both the Monell claim and also a claim directly against Chief Stewart, who was personally responsible for this. With that, Your Honor, I'll reserve my remaining time. Just one more question. You obviously concede we have no authority to overrule the Supreme Court on qualified immunity. I agree that you cannot overrule Supreme Court precedents, Your Honor. You're the Ninth Circuit. But I think there's a distinction to be drawn between overruling and basing a holding, in this case, on disagreeing with qualified immunity and recognizing, as the Fifth Circuit did, that there are serious problems with the foundation of qualified immunity jurisprudence. And essentially the reason we included this in the brief is we think, one, we think the argument is correct, that it's a scrivener's error and there's a host of reasons to reject qualified immunity. But what I think about it doesn't matter. What the Fifth Circuit and what the Ninth Circuit and what the other circuit courts might say about it is more impactful. And if we're going to bring this matter to the attention of the Supreme Court eventually, it's important to have courts such as yourselves consider this issue. All right. Thank you, counsel. I've asked you a lot of questions, taken a lot of your time. We'll give you your full five minutes for rebuttal. Thank you, Your Honor. Thank you. May it please the Court. Nick Carlson for Appalese David Kopp in Okanagan Behavioral Health Care. We ask this Court to affirm the summary judgment dismissal of the Section 1983 claims. The District Court got it right. No constitutional violation occurred. Plaintiff brought a claim for violation of Lankton's constitutional right to adequate medical care as a pretrial detainee against Kopp and OBAC. That claim boils down to this. Designated crisis responders must obtain medical clearance anytime they conduct an investigation under the ITA. And because Kopp did not do so, he violated Lankton's right to adequate medical care. That's wrong. As Your Honor was addressing, there appears to be no duty here for Kopp to have provided for Lankton's medical needs as a pretrial detainee. That duty rests with him. Counsel, is it correct that your client, while he was at his facility, did not consult the records to see that the decedent had been involuntarily committed several times or had been committed several times? Is that correct? I don't believe that's correct. If we look at his note from 3-24-18, so that's when he went to the jail, there's, I believe, a note that he discussed with Gary Lewis, and he knew about her prior conversion disorder diagnosis. At that point? Correct. I also believe that's correct, too, on the day before when he was at the hospital that he consulted with Gary Lewis, who was the one who did the evaluation that resulted in her voluntary commitment. But he indicated to a variety of people that he thought the decedent was malingering? I think that was the inference drawn. I'm not sure that he used that particular word, but he had evidence that indicated volitional behavior, which could support malingering, but not necessarily so. It's unclear, but certainly it supported his evaluation under the ITA that the statutory criteria was not met. Would it have supported his determination on his visit at the jail? That he saw volitional behavior? He was also told that by the jail staff of what they were observing. He saw they performed a drop test, lifted her arm above her head, and presumably if she had no volitional control, when you let go of her arm, it should have bonked her on the head, but it didn't. She stopped it from hitting her head. So he was seeing behavior that did support volitional control, which is part of the analysis under the ITA to determine, for example, if somebody is gravely disabled. So seeing all that, and even if it was volitional, she was in a condition that at least some people inferred presented serious risks. Even if she decided volitionally to stay in that position, that was not a safe position to remain in hour after hour, and later there were consequences. So my question is really aimed at his universe of knowledge the first time is not necessarily the same as his universe of knowledge the second time. And why is it that he had a basis to conclude that she was not at risk and did not qualify for involuntary treatment the second time? Well, two things. Why isn't that a factual issue? Well, two things. First, that isn't the nature of their claimed constitutional violation here. It's the fact that he did not order a medical clearance. It's less about whether he should have found the statutory criteria met and then we proceed with involuntary commitment. Regardless of that analysis, according to plaintiffs, he had a duty to get a medical clearance here, and that's just not correct. That's really what I'm trying to reach to, because if he's in a position to observe a condition that could be inferred to be unsafe, wouldn't that heighten the obligation? He's not a doctor. I accept that he's observing the limited scope of his responsibility. Is there a point at which it crosses over where his universe of knowledge is such that heightens the need for medical clearance or examination or something because it's not safe to remain in the position that she was in, even if she was doing it voluntarily? That is not part of the analysis under the ITA. We're also, while she's in the jail, so she's already had her liberty interest curtailed, if we're talking about just generally the responsibility here under what he's supposed to be assessing, if we're going to have a medical clearance every time somebody calls for an ITA investigation, we're going to have people taken into custody every time to the ER for a medical clearance just because a phone call was made. Now, in this particular instance, that seems maybe that, well, shouldn't there be some sort of analysis? Is there a tipping of the scale at some point? But the analysis that is being performed here is whether the condition that we're seeing this person in, is that being caused by mental health or not, and does it rise to the level of proceeding with involuntary commitment? Plaintiff cites no authority that a designated crisis responder may order a medical clearance strictly to address medical needs, separate and apart from a mental health evaluation for the statutory criteria. There's no basis to do that. And in this instance, it's also a little troubling because then we start to get into, well, if he's supposed to be looking for medical issues, now that's going against what he's actually supposed to be assessing, which is mental health, and is this a mental health situation? If she is so completely opposed, if she has put herself in a position, especially if she has done so volitionally, doesn't that raise some serious concern about her mental wellness? Perhaps, but, again, it's not just that somebody has a mental health issue. It still has to, again, rise to the level of the statutory criteria. And there has to be, if we're talking about an incorrect diagnosis or evaluation that goes to negligence, does it not deliver indifference? So on that, if I may, it's neither here nor there at this stage of the proceedings, but under Washington law, did Mr. Kopp owe a duty of due care to the decedent, either through the interactions at the first facility or the interactions at the jail? Under the ITA? No, under Washington state law, did he owe a professional duty of due care? I believe the answer is no. In fact, I mean, I guess it's hard to address it outside of the ITA when the ITA itself includes a limitation on liability if somebody is acting in good faith. But I believe courts have viewed this not as almost a doctor-patient situation. We're talking about essentially an initial assessment where we're even deciding whether we're going to move forward into the ITA process. I would just like to flip back to if we're going to force a designated crisis responder at the jail to have to move forward with medical clearance strictly because perhaps there is a situation here that might present for medical needs. Is he in the position of needing to step on the toes then of the jail and be in the position of saying, well, you guys are doing a bad job providing for medical needs? From a policy sense counsel, I suppose it would depend on how exigent the circumstances are and how much, for example, in this case it was generally known that lying supine in your own urine for 21 hours significantly increases the risk that you're going to be seriously ill or die from pneumonia or a pulmonary embolism. Correct. And just to sum up, we've got the jail staff telling him about this concern. So they're expressing their concerns from a medical perspective and were under the delivered indifference standard. And he did tell them, well, follow your medical protocols because addressing medical issues is outside the scope of my practice. And certainly that's not deliberately indifferent to trust that they're going to follow their protocols, which they did. All right. Thank you, counsel.  Good morning, your honors. My name is Mike Kylo and I represent the county defendants here. May it please the court, I'll start out by stating that most importantly here, the plaintiff, if this decision is upheld, is not left without a remedy. They still have very viable state law claims. I'm not going to address the veracity of those claims or admit them at this point, but they certainly have a negligence claim and a wrongful death claim under Washington state law. The narrow issue that you are being asked to determine here is not whether there was negligence. The majority of plaintiff's arguments are addressed directly at foreseeability, which is obviously an element of a negligence claim. It is not an element of the deliberate indifference standard, which is an extremely high standard to meet. What we're asking the jailers here to do is to be able to look at Ms. Langton as she lays on the floor of the jail and determine that she's going to suffer a pulmonary embolism. I respectfully counsel, I have to push back on that. I think what we would be asking the jailers to do at some point, given the facts and the light most favorable to plaintiff of what they were aware and see someone in the state that the decedent was in lying supine, whether or not there was some voluntary component in her own urine on a mattress for 21 hours, knowing that that increases the risk of pneumonia and a pulmonary embolism, whether in the light most favorable to plaintiff that rises to the level of deliberate indifference. And again, putting the supervisor aside, why doesn't it? I'm having a lot of trouble seeing why the facts in the light most favorable to plaintiff don't rise to the level of deliberate indifference, given the undisputed facts here. Understood, Your Honor. And there is testimony in the record from the jailers that, yes, they did understand that lying in the supine position, not moving for a period of, whether it's 18 to 21 hours, in the light most favorable to the plaintiff will go with 21, even though that's disputed, that that's not that much different than many other people who come in, people on drugs, people under the influence of alcohol, people sleep for hours and hours and hours. And these jailers didn't specifically think it was odd at that point, up until they finally had Kopp come back in and then they decided, well, let's send her back to the hospital because something's clearly not right here. And again, I think the argument that they knew that blood clots could form while lying supine in the urine, well, I must digress quickly, and that's that I don't think the urine is particularly apropos here. I think it's kind of a red herring because urinating yourself is simply not a sign of a pending pulmonary embolism. People come into the jail incontinent all the time. So there's there's, you know, drunk people that sleep for 15, 20 hours or lay in their cell and don't move much. And honestly, the the jailers here twice were able or were entitled to rely upon David Kopp's evaluation, which was that she was malingering. We heard about the arm drop test. There was other instances where the physicians of the hospital stated that she was moving her eyes. She was tracking them. Counsel, is it correct that no entries were made in the jail record until after it was known that the decedent was likely to die? They did not do the initial fit for jail assessment, if that's what you're you're referring or anything else. Right. Any, any, any notes until after? That's correct, Your Honor. But again, I don't think paperwork essentially is has any causation towards the Miss Lankton's death here. No, but it is that she was left unobserved for 18, 21 hours. She was in the one cell, the one holding cell. It's a, you know, a tank where you put people who are unable to who will not, you know, participate in the in booking process. And it's the one cell that actually had a video camera. So she was observed the entire time. And there were multiple officers that went in the cell and saw her moving her eyes, tracking them to check if she was more or less deciding in their mind, deciding whether whether this was volitional or not, and more or less deciding whether or not she was fit for jail at that point or whether she needed to go back to the hospital. I think the as far as the Monell claims against the county goes, those the plaintiff's theory here is more or less vicarious liability with regard to the county's responsible because an employee to tort fees are more or less. And it is possible that a jury could determine on the state law claims that the county employees were negligent. That is very possible. But under let's see, it's under under Monell itself. A municipality can't be held liable solely because it employs a tort fees or or in other words, a municipality cannot be held liable under Section 1983 on a respondeat superior theory. And that's Monell at 691. Instead, in order to establish municipal or county. So council, I'm looking, for example, at expert Stewart's report. And I think it's at three forty one of the ER. And he said he talks about that after cop arrived, OJ, O.C.J. staff informed cop that have Miss Langton remained in the prone position for an extended period of time that she might develop blood clots or pneumonia. What policies or training did the jail have with regard to implementing due care requirements when somebody was lying supine for a very extended period of time? It's an understandable question. And we have to put this into context somewhat that we're dealing with a very rural county here. It's a very small jail. This is out in Omak. I'm not sure if you've been to Omak, but it's very small. They they had drafted policies, but none of those policies had actually formally been adopted when this occurred. It's my understanding that they now have different policies, but that's not before you. And that's not the issue we're here to decide today regarding the Monell claim. They have to. The plaintiff here has to actually or the appellant has to actually point to a. Policy that was in place that was violated at the time. And here there's no policy that was in place whatsoever. So the Monell claims argued that the county did not provide health training or provide guidelines and sites who they describe a Dr. Ray, who they describe as as the county's own expert, is acknowledging that fell below the standard of care. Is the lack of a policy something that the county could be held responsible for? I don't believe so under Monell, but maybe under a negligence theory or real wrongful death theory, Your Honor. It looks like I'm just about out of time, but the last point I want to make here is that you have to be aware that the. Jailers themselves have to be aware of the particular harm that they disregard wantonly. And that's not negligently. That is wantonly almost. It's above reckless. It's deliberate indifference, which is an extremely high standard. And there is no sign even from the ambulance medic on the way back to the hospital after she left the jail. There were no signs that a pending pulmonary embolism was about to occur. Thank you. All right. Thank you. I appreciate your honor's indulgence with the extra couple of minutes to get my five here. I want to start by I'll go in reverse order of what you just heard here. I have to address a couple of things. The first is kind of this explanation of what the jailers thought about what was going on. And as clear evidence as you could get that they knew there was a problem from the moment she arrived is that they put her in the crisis holding cell. Has that written on the door? And they did that because obviously something was wrong with her, whether it was volitional or not. Something was clearly wrong and they thought we need to monitor this. However, as as we've identified in some of the cases, you know, monitoring is is a start, but it is not sufficient after a certain point. And when that point is reached is usually an issue of fact for the for the jury to consider. And we've submitted, I think, significant evidence that that would support a jury, concluding that it was not reasonable to do that at any point and definitely not reasonable to do it after hours of time passed. I also just want to note that, you know, when we're talking about what she was doing, she was being watched by these jail officers the whole time and she was not asleep. She went through the night. She did not go to sleep. She was awake with her eyes open the whole time, at least according to the testimony of the officers. I also want to address briefly the point that we still have a remedy under state law if this court affirms the district court's ruling. And I take some umbrage with that because of the nature of the district court's ruling, which was very absolutist. You know, if you read the order, it says things like she did not display any signs of medical distress at any point, which given this record, I don't understand, frankly, how that was a conclusion that the court could reach. But I imagine the county would assert that that conclusion was binding on us in any subsequent state case if this court were to affirm. I want to now turn to the issues addressed by counsel for OBHC and David Kopp. And I want to start by correcting some of the record. There isn't any evidence that David Kopp looked at records about her prior commitments before either of his time seeing her. David Kopp himself testified he didn't know whether or not he'd done that. That was my recollection. He did not know whether he had done that. And his records, which he was required to note in them if he had done that, do not say that he did it. So from our perspective, there's at the very least a dispute of fact about that issue. The next issue I want to address is this idea that there's some parade of horribles that will happen if jails are required to have medical clearances of detainees prior to having a mental health evaluation done. And frankly, that should be happening in every jail already because there should be a screening process happening at every jail when someone arrives. And the parade of horribles counsel alleged isn't even going to happen because the legislature amended the statute after this incident took place and reduced the requirement for medical clearance. They didn't do it in a jail. That requirement they did not touch. But in the community setting, there's now specific provision in the statute saying you don't have to get medical clearance first. And to briefly draw your Honor's attention to the actual statute on the point that there is no obligation to get a medical clearance first. One, we think that's contrary to their own policies. But two, in the statute itself, when it defines a medical clearance, that definition states as follows. A physician or other health care provider has determined that a person is medically stable and ready for referral to the designated crisis responder. That means that's happening first before they are referred to the crisis responder. And finally, I want to note that the idea that there is no duty under state law, that's just incorrect. There is a duty. Whether or not that duty is one of, you know, avoiding simple negligence or an elevated standard, there is an elevated standard under state law for DMHPs. But there is a duty. That is absolutely part of this. And to the extent the court ultimately decides to reverse in part or doesn't grant total relief that we're requesting here, the state law claims that the court declined to consider through supplemental jurisdiction, if any of the federal claims come back, those should all come back as well. Otherwise, we're going to be in this awkward claim-splitting position of filing in two courts, and that's just not appropriate here, we think. So with that, Your Honors, I thank you for your time and ask that you reverse. All right. We thank counsel for their arguments, and the case just argued is submitted.
judges: HAWKINS, CLIFTON, BENNETT